Good morning, counsel. Good morning, Your Honor. All right. For both sides, I'd like you to identify yourselves for the record. And for the appellate and the appellee, you have 15 minutes apiece. We are not going to interrupt you after you've made your presentation. We will take turns asking you questions. And then, again, for whoever is the appellate, you can tell me how much time that you want to reserve for rebuttal. And you can proceed. Who is the appellate? Again, my name is Jonathan Pilsner with the Office of the State Appellate Defender. I represent Ms. Cara McKnight, the appellant in this case. And just for reserve, I'll reserve approximately five minutes for rebuttal. All right. Thank you, counsel. Good morning, Your Honors. Counsel, on behalf of the people of the state of Illinois, my name is David Greenspan. I will be representing the appellee in this matter. Thank you. And counsel, Mr. Pilsner, you can proceed. May it please the court and counsel. Looking at the issues in this case, this court will come back to one constant and unavoidable theme. There are gaps in the state's evidence. Gaps the state asks you to fill with speculation and conjecture. Gaps it cannot fill itself with the evidence that it presented in trial that leave many questions and very few answers. But even viewing this evidence in the light that this court must, it is not sufficient to meet the state's burden that Amelia was accountable for Connor's murder. And for ease, I'm going to use Amelia's first name because there are a lot of if the evidence in this case is sufficient to sustain Amelia's conviction on appeal, the evidence here is closely balanced and the other errors that she has identified in this case are either not harmless beyond a reasonable doubt or alternatively established plain error. It is undisputed that Amelia went to Sloan Carr's apartment to get her brother Cedric's social security check. Amelia and Cedric both testified credibly and unimpeached on this point that Cedric told Amelia to go get that check so that Cedric could pay for a lawyer. Cedric of course at this time was in custody in the Coke County jail. There is nothing criminal about going to your sister-in-law's apartment to retrieve your brother's check to pay for his lawyer. The state would have you believe that Amelia's purported criminal intent was to procure that check by illegal means and that she developed that intent or developed a common criminal scheme before she knocked on the door with her boyfriend Marvel Fisher. But there are a lot of questions with this theory. Why for example would Amelia take her 10-year-old son along if she intended to forcibly invade Sloan Carr's home? If Marvel Fisher, her boyfriend, was the muscle, why did he only use force after Connor hit Amelia? And when he did use force, why did he not reach for the gun right away? If Fisher was armed and the goal was to procure this check illegally, why did Fisher hang back instead of forcing his way into the apartment at gunpoint the moment the door opened? And when the fight broke out between him and Connor, the eventual victim in this case, why did Fisher not reach for the gun first instead choosing to engage Connor physically in fisticuffs? If their intent was criminal from the beginning, why did Amelia seek to speak to Sloan Carr first instead of bursting through the door the moment Connor opened it? These are not acts of someone would take in the moments before enacting a criminal scheme that they agreed upon before they knocked on the door. And if their end goal was to get the check for Cedric, what did Amelia and Fisher have to gain from this criminal conspiracy? These are all questions the state's evidence begs but does not answer. Instead, the state contends that because Connor was shot and Amelia was there, she must be accountable. But the case law is clear. Presence at the scene of a crime and flight from it is insufficient to make a defendant accountable, even if the defendant knows a crime has been committed. Our Supreme Court has been clear on that black letter law in cases like People v. Taylor. But that's the extent of the state's case here against Amelia. There is no evidence that they shared a criminal intent or a common criminal design, and that is the biggest gap in the state's case. Although the state was unsure below before the First, we need to ask what evidence there is that Amelia shared his criminal intent before the incident began. But again, there isn't any evidence that Amelia shared Fisher's criminal intent. Fisher's first role in this incident is when the fight began and he engaged Connor at the door. There is no evidence that there was a shared criminal intent before that moment happened. And if Fisher went to that apartment intending to commit home invasion, he didn't do anything until Connor intervened and hit Amelia. That's the first time Fisher did anything. None of that proves that Amelia had a shared criminal intent that Fisher did, particularly if any criminal intent Fisher developed, developed in the moments of the incident. There also is no evidence of a common criminal design between Fisher and Amelia herself. There's no evidence that before they walked the door, they had agreed that they were going to burst into the apartment and that Amelia was going to be part of that scheme. The only evidence establishes conclusively, in my opinion, that Fisher's actions begin only after Connor interacts with Amelia by throwing a punch of some sort at her. Because there are so many gaps in the state's case, much of their argument is untethered to the record. The state does accurately note the general principles of accountability law by citing the cases like Henry W.C. and People v. Smith, but those cases are factually different. And once the state tries to apply the well-established principles of accountability law to the facts of this case, their argument begins to fall apart because, again, there's no evidence of anything before or during the action that ties Amelia and Fisher's criminal intent or common criminal design together. The state claims that the evidence shows Fisher was bum-rushed into the apartment with Amelia immediately, and that since his actions were immediate and without hesitation, that proves that they were not spontaneous, but instead were planned from the outset. But when the state makes these assertions, it doesn't cite to the record, and that's why they are nothing more than conjectures. They aren't reasonable inferences. The state does cite to cases like People v. Perez, but again, Perez traces its ultimate logic back to People v. Taylor, which I brought up before, where our Supreme Court argument is equivocal that actions after the incident may help prove the state's case, but there must be some indication that before or during the incident, the person who is accountable for the principal's actions did something to intentionally aid or abet the principal in that criminal conduct. And we don't have that here. The state cites to a lot of facts beginning on page 24, but those facts simply establish Fisher won his fight with Connor. If anything, it establishes Fisher's guilt, and Fisher's guilt alone, but that's not enough for the state here to prove Amelia is guilty of first-degree murder. It doesn't prove her accountability. After that, the state does talk at length about what Amelia did after the incident, but again, that simply can support if there is evidence before or during the incident, which again, there is not here. There is no evidence that Amelia knew Fisher was armed when they went into the apartment, which makes sense because if she did, why would she bring her children to an apartment with an armed man when they were intended to forcibly take a check from Ms. Sloan Carr at gunpoint? There is also no evidence that Amelia assisted Fisher in shooting Connor. Again, Fisher's involvement only came after Connor swung and hit Amelia, and everybody testified that the fight was only between Fisher and Connor. Amelia had no role in that fight. Even looking at this evidence in the light most favorable to the state, there must be something to look at, and there is simply not enough here to prove that Amelia and Fisher were engaged in a common criminal design or shared a common criminal intent, thus making Amelia accountable for Fisher's actions. However, even if the evidence is sufficient to convict, it is certainly not overwhelming. The other errors Amelia raises here, such as the court improperly limiting counsel's ability to argue whether or in their in their cross-examination of her, are not harmless because the evidence in this case was so close, and because the evidence was closely balanced, the error in admitting Amelia's privileged statements to her husband, Rick McKnight, amount to plain error or alternatively counsel's ineffectiveness. In the interest of time, I won't address those errors in detail here in my opening statement, but I'm happy to address any specific questions on those topics if the of the multitude of issues that this case presents. Can I ask a question, or are we going in order? Judge Lampkin? Justice Lampkin? She's frozen for some reason. Let me see if I can get her reinstated. We're going in order, yeah. We're going in order, yeah. Justice Williams? Oh, okay. Counsel, I have a question. You indicate that the evidence was closely balanced, but yet when the evidence was presented before a jury, they found her guilty of felony murder, they found her guilty of first degree, as well as home invasion. So if it's that closely balanced, how did the trier effect make an assessment that she was guilty on all those three counts? Are we talking about closely balanced in the concept of the other errors or in the sufficiency? Because I think first off, that does change the way that we look at it. The way that accountability law works and the way that it was presented in this particular case did make it seem, I think, to the jury that this was kind of an all or nothing case. This case was not presented terribly cleanly to the jury, if I may be so honest. And so the fact that the jury convicted of everything, I don't think indicates that the evidence was not close. The jury may have heard the accountability, heard that if Fisher was guilty, then Amelia must have been guilty without fully comprehending the intricacies of accountability law in this case, in the way that it was presented, particularly considering the fact that so much of this flows through the home invasion count. The felony murder and the accountability flows through Amelia's participation in the home invasion, because the evidence was that Amelia did not, there was no evidence that Amelia fired the shot. There wasn't a lot of evidence on who fired the shot. And so for the jury to convict her, they had to find on the home invasion. And from the home invasion, that kind of opened the door to the other convictions. And that's why the error, particularly the error on the closing argument by not allowing counsel, by limiting counsel before that argument began, to argue the authority that Cedric had imparted upon Amelia was so important. Because if that, if counsel's argument isn't limited like that, perhaps the way the jury views this changes slightly. But either way, I think the evidence still is close. If the jury believed the home invasion, then the felony murder kind of follows suit with the home invasion, because guilty of the home invasion, the felony murder follows because of Mr. Conner's deceased body, and accountability follows after that. And it's easy for the jury to reach those conclusions, if that answers your question. Okay. All right. I'm up for the questions. Justice Burke. Mr. Pilsner, I'm going to throw you a softball here. Mrs. McKnight was convicted of both count 37 and count 38 of home invasion, correct? I believe so. Yeah, I don't know. One was for the home invasion with Conner, and one was for the home invasion for our Keisha. And both of those were sentenced. Is that correct? Yes, they were. Okay. It's pretty black letter law that you cannot receive multiple convictions for home invasion when it's the same action. It's just multiple people in the same house. Is that correct? Yes. And I'm familiar with that line of case law. Okay. But that wasn't raised in your brief? No, it was not. All right. That was my only question. Thank you. All right. Did you want to say something? I didn't want to. Judge, that was a conscious decision based upon the complexity. I wanted to answer, Judge. I'm sorry, Your Honor. I didn't mean to speak over you. I don't think you did. I think we're having a problem with the system. I don't think you were at all. But thank you. We'll come back to you, Counselor for the appellee. All right. If Your Honor has no further questions for our appellant counsel, then I will begin. Thank you, Your Honors. Counsel, may it please the court. Again, my name is David Greenspan, and I represent the appellee in this matter, the people of the state of Illinois. Let me begin by first emphatically stating that this was not a closely balanced case. The and it overwhelmingly showed that defendant had an intent to commit a felony inside the apartment of Arkeisha Sloan Carr, that it was a violent felony, and that as a result of this intent and defendant's actions to forcibly enter the apartment, Mr. Connor, the victim here, and for that reason, defendant is guilty of murder by accountability. Let me just quickly go over the facts of this case so that I can lay a complete picture for you. First, the evidence clearly shows that defendant went to the apartment of Arkeisha Sloan Carr in early April 8, 2011, where she demanded money from Ms. Sloan Carr and was told to leave after an argument in the stairwell. Following this argument and this refusal, defendant said that she would return for the money and did so approximately one week later on April 15, 2011. However, this time, she returned with her two young sons and her co-defendant Marvell Fisher, as well as a loaded gun. We know from Jeremiah's testimony that everyone knew that Fisher was armed when they exited the car. Jeremiah testified to seeing an object in Mr. Fisher's hand as they exited the car and the testimony showed that defendant was seated in the back seat of the car with Fisher and exited the car together. Furthermore, once inside the apartment, the testimony of Ms. Sloan Carr was that the defendant specifically asked Jeremiah to go out and get my gun because I'm fitting to kill her. When the three individuals, defendant Mr. Fisher and Jeremiah, approached the apartment, as counsel has stated, yes, defendant attempted to speak to the occupants of the apartment as they walked up. This shows that they knew the apartment was occupied by at least one individual. However, counsel states that they only attempted to enter the apartment after Connor attempted to one important fact here. Mr. Connor only attempted to prevent defendant and Fisher from entering the apartment after telling them to leave. In fact, the evidence shows that Mr. Connor tried to slam the door shut on them after telling them to leave, at which point, Ms. Sloan Carr and Jeremiah both agreed that defendant lowered her shoulder and attempted to bum rush her way into the door. They described bum rushing as the action of lowering her shoulder and forcing her body weight into the door. At that point, Fisher did not hesitate at all to enter the apartment. Fisher was standing ready and waiting, fully armed. He did not stand back. He did not hesitate. He did not wait to see what happened next. He forced his way in immediately after defendant and began struggling with Mr. Connor, at which point, he aimed his weapon directly at Mr. Connor and fired one fatal shot before fleeing the apartment. Everyone in the apartment knew that a gun had been fired. The testimony is clear on that. The only person who denied knowing that there was a gun fired in that apartment was the defendant herself. However, she was aware that the struggle had occurred. She watched as Mr. Fisher fled the apartment and watched as Mr. Connor attempted to chase after him, but instead of following them to try to sort out what was going on, instead, she forced her way further into the apartment chasing after the fleeing Ms. Sloan Carr who retreated to the back bedroom to protect her young daughters. Defendant did not knock on the bedroom door. Defendant did not call out for Ms. Sloan Carr. Defendant went to the door and kicked the door in. She admitted this herself in her own testimony. She kicked the door in and while in a rage, she forced her way into the bedroom and immediately started demanding money from Ms. Sloan Carr. She did not ask whether Ms. Sloan Carr or her daughters were okay. She did not ask, you know, what just happened out there. She said, where's the money? Are we going to go cash this check? And when Ms. Sloan Carr denied having the money, she told her son to go get her gun because she was going to kill her. The only reason that had been called. And once she knew the police had been called, she did not hesitate to flee the apartment herself. And when confronted outside the building by Linda Stephens, who asked whether or not she knew the dying man laying on the ground just outside the building, defendant denied knowing him, denied knowing anything about where he came from, did not hesitate to leave the scene with her sons immediately. She didn't wait for police. She didn't wait for EMS. She did not try to render aid. She simply got out of there as quickly as possible. And once she fled the scene, she spent the next month actively evading the police and failing to contact the police, even though she had several opportunities to do so and testified that she was well aware that the police had been trying to contact her. Furthermore, she tried to conceal the act of Mr. Fisher. She tried to dispose of a firearm as well as other evidence that would link her to this crime. And she admitted to multiple people that she was well aware of the crime that had been committed and that she was considering turning herself in and taking the blame for that crime because she believed that the police would be lenient on her. All of that evidence taken in a light most favorable to the people show that defendant clearly intended to enter that apartment forcibly, clearly intended to take the money by whatever means necessary, including violence. And it shows that she continued to try and conceal evidence of this crime, as well as maintaining a very close relationship with the shooter, Marvell Fisher, long after the incident had occurred. All of these are factors which the jury was allowed to, and in fact, required to consider in coming to their decision. Here, the jury's verdict was completely reasonable, given the evidence on the record. And it was not unreasonable for the jury to conclude that a common criminal scheme existed. I really want to point out that counsel made a lot of arguments relating to who was the principal and who wasn't the principal. And in fact, it really doesn't matter in this case, who was the principal. What we have is evidence that the defendant went to this apartment specifically to get money. We know because she went to the apartment previously to get the money, was rebuked and came back, this time with companions. Counsel asked, why would she bring her young sons with her if her intent was to go in and commit a violent act? Well, the record doesn't give us any clear indication as to why she brought her young sons with her. However, the testimony does show that the defendant really didn't care whether her sons were present or not, if she was committing to commit this violent act, because she specifically asked her 10, 11-year-old son, Jeremiah, to go get her gun so that she could kill Ms. Sloan Carr. It's also important to note that when we're talking about it does not matter whether the defendant intended to kill anyone when she went to that apartment. The only thing that matters is that she intended to commit a crime and that Fisher's actions in furtherance of that crime creates this accountability for the ultimate act, which in this case resulted in the death of Jamar Conner. In fact, in the People v. Hernandez, which is the 2014 Illinois Supreme Court case that looked at accountability, the Fernandez court specifically rejected the premise that a defendant specifically intended to commit or facilitate a co-defendant's motion, then accountability still applied. Additionally, Fernandez specifically rejected the premise that the defendant had to know that a co-defendant was armed prior to that co-defendant committing a criminal act. Here we have evidence that very clearly indicates that defendant knew that Marvell Fisher was armed. However, whether or not she actually knew that he was armed is irrelevant. She was aware that there was a gun, that it was a loaded gun, that it was capable of inflicting deadly force. She specifically asked her son about it before leaving the apartment. If the court were to find that there was not enough evidence here to find defendant guilty of first-degree murder under an intent or substantial likelihood standard, however, the evidence is still more than sufficient to show that defendant is accountable for felony murder. Again, the evidence shows that she clearly intended to procure money that was not hers, and this money was likely fraudulent in the first place as her brother, Cedric Carte, testified that he was receiving the Social Security disability money while he was incarcerated, and though he denied whether or not he should have been receiving it in the first place, had defendant successfully obtained this money and cashed it, it would have been an act of fraud. The defendant admitted that she was going to the apartment specifically to get this money. The defendant also admitted that even though she supposedly had a key to this apartment and permission to enter the apartment, she did not have the key with her when she returned to the apartment for the money. The evidence also clearly shows that she forcibly entered the apartment without lawful authority and with the intent to commit a felony inside the apartment. There were multiple people inside the apartment. There were at least four people in that apartment even though only two were charged in this matter, and it's clear that the co-defendant, Mr. Fisher, was armed and that the defendant knew this. Now, just really quickly, I'm going to touch on the other matters here. Council says that this was a closely balanced case. Of course, the people's position is that this is not closely balanced, that this is an overwhelming body of evidence. Here, just on the issue of the impeachment, I'd like to emphasize that the trial court in this matter ruled properly that the defendants... Don't spend your time on that. Spend your time on the marital privilege issue. Yes, Your Honor. All right. Then, if I may, I will pivot to the third issue on this matter, which was the marital privilege. There are two principal statements that are at issue here, one in which the defendant asked or, excuse me, admitted that Marvell Fisher, her co-defendant, had shot someone, and a second statement where she indicated that she was considering turning herself into the police and taking the fall for the shooting and with the hopes that the police would show lenience on her. Now, the evidence in this case indicates clearly that there was no privilege to assert. The reason I say this is because in order for the defendant to assert marital privilege, and let's be abundantly clear here, it is the defendant's privilege to assert, and she must affirmatively assert it in order for that privilege to apply. That was not done at any point within the course of this case. It wasn't done in pretrial motions, and it wasn't done at any point during the trial. And the reason that it wasn't done is because ultimately there was no privilege to assert. In order for there to be privilege, there must be an expectation of confidentiality in the statements that were made. Here, we know that there was no expectation of confidentiality in either of those statements, number one, because defendant admitted making the same or a substantially similar statement to another individual, notably her sister, who would not be covered under this privilege. And second, one of the statements was made in the presence of all three of her sons. The statement where she told Mr. McKnight that Marvell shot someone, we know that that statement had to have occurred in the presence of her three sons. The fact that it was in the presence of her three sons in the trial indicates that after the shooting occurred, the defendant, with her two younger sons, was picked up outside the apartment building immediately by her older son, Rick Jr., who then drove them directly to Mr. McKnight's apartment. The phone call had to have occurred during that car ride, which means that it was made in the presence of at least three other people, none of which are covered by that privilege. We know that it occurred in the car ride over because all of the testimony, all of the evidence in this case suggested that there was no stops, there was nothing. It was after the shooting, defendant and her three sons drove directly to Mr. McKnight's apartment, and Mr. McKnight's own testimony says that he received that phone call and approximately five to ten minutes later was when the defendant arrived with her three sons. In regards to the ineffective assistance of counsel argument here, because there was no privilege to assert, there cannot be asserted. Case law is abundantly clear on this, that where a motion to exclude or a motion to assert privilege would be otherwise frivolous, failure to assert such a privilege or to raise such a motion is not ineffective assistance of counsel. Additionally, I would just point out that to the extent that the record in this matter is undeveloped, it would not be proper for this court to consider things such as counsel's mindset or any strategic decision here on direct appeal. Such matters would be better decided in a post-conviction petition and such proceedings. So with that, I am going to conclude and ask that this court affirm the verdict below on all counts and the 51-year sentence as well. Thank you. Thank you, counsel. I do have a question. It seemed that you argued that there was enough evidence for intentional murder, but if there wasn't, there was enough evidence for felony murder. Well, and this is my position. If there is insufficient evidence of intentional murder, but enough evidence for felony murder, wouldn't the underlying felony convictions have to be vacated because they were the underlying felony for the murder conviction, wouldn't you just have a 30-year sentence for felony murder? That's part of my question. Because I'm really having a very difficult time seeing from the evidence how you proved before or during the commission of the offense. And I don't mean the home invasion, but before or during the commission of defense with the intent to promote the offense, they had come to some kind of agreement before they got to that location. That's what is difficult for me. I don't see that from the record that you have shown intentional murder. So I'd like you to tell me if there is sufficient evidence to support a conviction for felony murder, do the underlying convictions for home invasion still stand? Thank you, Your Honor. Just to clarify your question, you're asking whether the home invasion counts would merge with the felony murder for purposes of sentencing? Yes. Okay. It is the people's position that were this court to find defendant guilty of felony murder only that the underlying convictions would merge under the one act one crime doctrine. However, I would just like to emphasize that the people strongly assert that the evidence was sufficient to find defendant guilty by accountability of first degree murder under an intent or substantial likelihood standard. And I just want to really emphasize here that there does not need to be an express agreement or plan in order to- I know that. I know there doesn't have to be an express plan. I'm looking for the how I can infer that they planned ahead of time. She went to the house, and I mean the defendant here, went to the home the first time alone. The second time she comes, there's nothing to say that they had a discussion. You say that she knew that there was a gun in the car, but there's no evidence that she knew that Fisher had a gun other than a child saying, I saw something in his hand that I can see it. I admit I have not read the whole record, but I certainly will before I make a decision on this. But that's what I see. And then I have heard from the testimony of, I can't think of it, saying that the defendant said, go get my gun. So, I mean, so we have evidence that it's not even Fisher's gun. I'm having a very difficult time seeing how you can prove accountability on an intentional or knowing murder. The argument certainly is stronger for felony. If I may respond briefly, Your Honor. There are three points that I would like to make in response to your statement just now. First being that you are absolutely correct that defendant went to the apartment alone previously before the incident involving the shooting. When she came back, she came back with muscle included because she had been rebuked the first time. Recall that the evidence in this case shows that Ms. Sloan Carr did not know Marvell Fisher, hadn't really met him before, was only vaguely aware of him and his relationship to the defendant. And Mr. Fisher, likewise, based on the evidence that we have at trial, did not know Ms. Sloan Carr or her children. He had no reason to be at that apartment. The only reason that he was there was because defendant brought him. And why would she bring him unless she intended to use him to help get inside that apartment and to take the money that she came for by force? And again, that supports felony murder. That supports felony murder. She brought him to get into the apartment. To me, I don't know. I know what your argument is, but I'm having a very difficult time with it. I understand, Your Honor. The third point I'll just make very briefly is that she did bring a loaded gun with her. Whether it was Fisher's gun or her gun does not matter. She brought a loaded gun to an apartment with the intent of procuring money that wasn't hers. She had no reason to bring that gun unless she intended to use it either to intimidate the occupants inside the apartment into giving her that money or committing an act of violence. Now, and as I said, I haven't read the record, so I don't know if you just made it a misstatement to me, but from what I've read in the briefs, there's no testimony that she brought a gun to the apartment. She told her kid to go get her gun. She brought the gun in the car. She brought it to the location where the apartment was and told her son to go get it. Obviously, with the knowledge that the gun was in the car, if it was not in the car, it was in Fisher's hand. That is a reasonable inference here, but we can reasonably infer that defendant knew that there was a loaded gun somewhere in the immediate vicinity and that she intended to use it for some illegal purpose. All right. Thank you, counsel. Thank you, Justice Reyes. Yes. Okay. Regarding the common criminal design, all right, and you keep mentioning that she brought Fisher in there, but the testimony appears to be that, you know, she traveled separately. She didn't travel with him. All right. So that's one. And then second thing was regards to the intent. You know, she went there to go get the check. She says that she never went there with any type of plan or intent to commit a crime. And I think the fact that the gun, her gun, is in the car might be indicative of that when she got to the location, she would have brought her gun with her. So, Your Honor, to respond to your point, there was some testimony that she and the defendant and Mr. Fisher came to the location separately. However, there's also testimony that the two of them came together. That testimony came from Jeremiah, the younger son, who testified not only that they had all come together in the same vehicle, but that the defendant then told him to lie about coming to the apartment in the same vehicle with Fisher, not just to the police, but also to the grand jury, which he then later admitted he had done and admitted he knew was false. So not to interrupt you, but so when Jeremiah is talking about we all went there together, he's also including Fisher. Correct. Okay. Correct. And to your second point, I understand what you're saying about her not bringing the gun with her. But again, I will return to this idea that defendant knew that there was a loaded gun, that she had brought it with her intentionally to the apartment with this purpose of obtaining money from our Keisha Sloan car by any means necessary. Whether Mr. Fisher had picked up the gun ahead of time or had left the gun in the car, the fact remains that the defendant clearly knew about the presence of a loaded firearm and clearly had the intent to use that loaded firearm at some point in time. Because again, her immediate response being told that Ms. Sloan car did not have the money. And this was again, after she kicked down the door to Ms. Sloan car's bedroom forcibly, which she admitted on cross as well. She told her son to go get the gun because she was going to kill Ms. Sloan car. The testimony was abundantly clear on that point. Okay. Thank you. No further questions. All right. Justice Mr Greenspan, do you agree that the trial court erred in entering judgment on both count 37 and count 38, two different counts of home invasion? Based upon the case law, I would agree that those two counts would normally merge under the one act one crime doctrine. Okay, thank you. That's all. Thank you. Thank you, counsel. Mr Pilsner. Thank you, your honors. Real fast. I want to point out that there is inconsistency about what Miss what what Amelia said when she kicked open the door to that bedroom. The state portrays that as unequivocally clear that she knew about this gun because she said that she was fitting to kill Ms. Sloan car. But Jeremiah, the state's own witness was cross examined extensively on this point. He was in the room. Everybody agreed he was in the room. And Jeremiah said that his mother never made any such comment on that. So there is even conflicting testimony on that. That's not as ironclad as the state would pretend it to be. A couple of other real quick things. And Justice Lampkin, you highlighted some of the inconsistencies. So I'm not going to go back over that when it comes to the different statements from Jeremiah in this case. As for the marital privilege issue, I admittedly the there that counsel didn't challenge these things. And so we have to reach this either through a plain error or an end or ineffective assistance. But the record is clear here that the statements were made over the phone. And the state doesn't tie up the evidence that the state presented doesn't tie up that Miss Carmichael night was with her sons the entire time. And so I think that issue still has validity here. And this court can reach it if it so wants to. Also, although we don't need to know what's inside of counsel's mind, we can tell if this is damaging evidence and there's no reason why counsel and the right or the ability to suppress it is unequivocal and clear. If counsel misses the boat, we can still reach it on direct appeal. We don't need to understand what was going on in counsel's mind because there's no strategic reason why these statements should come in. Lastly, if I just want to highlight one particular thing, if this court finds that the evidence is insufficient to sustain the intentional and knowing murder conviction, we're still left with the felony murder in the home invasion. And I want to highlight one last thing that I think is important to keep in mind. Keep in mind that counsel was barred from arguing the authority question before the jury fully in the trial court. So even if the intentional and knowing murder is tossed aside because there's insufficient evidence, counsel's limitation in that argument takes on a greater role of importance. So even if the evidence is sufficient in a sufficiency of the evidence analysis to sustain the home invasion and the felony murder that accompanies it, it makes that later error by barring counsel from fully arguing that in closing arguments that much more damaging because that was such an important thing. I guess the home invasion is kind of the gateway to the murder conviction for the state here. And if there's not enough evidence for intentional or And with that, unless there are further questions, I think the court for its time and the cooperation with the oral argument today. I have no further questions, Mr. Justice Reyes or Justice Burke. No questions. Thank you. All right. Thank you, counsel. We will certainly take this case under advisement. Have a wonderful day, everybody. Be safe. Be careful.